| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street, Denver, Colorado 80202<br>Telephone: (303) 606-2300 | DATE FILED<br>March 21, 2025 6:52 PM<br>FILING ID: 9ABCBC0AA2604<br>CASE NUMBER: 2025CV31055 |
| ERIC SINCLAIR, an individual<br><br>Plaintiff,<br><br>**v.**<br><br>SCHOOL DISTRICT NO. 1 a/k/a DENVER PUBLIC SCHOOLS; DENVER PUBLIC SCHOOLS BOARD OF EDUCATION, including the following current or former board members: XOCHITL GAYTAN, President, in her official capacity; AUON'TAI M. ANDERSON, Vice President, in his official capacity; SCOTT ESSERMAN, Treasurer, in his official capacity; MICHELLE QUATTLEBAUM, Secretary, in her official capacity; CARRIE A. OLSON, PH.D., Member, in her official capacity; CHARMAINE LINDSAY, Member, in her official capacity; SCOTT BALDERMAN, Member, in his official capacity; and SHAWNE M. ANDERSON, in his official and individual capacity.<br><br>Defendants. | ▲ Court Use Only ▲ |
| *Attorneys for Plaintiff:*<br>Nicole M. Quintana, Atty. Reg. No. 42675<br>Michael T. Mihm, Atty. Reg. No. 14678<br>Clayton E. Wire, Atty. Reg. No. 41717<br>Alyssa E. Hill, Atty. Reg. No. 56429<br>OGBORN MIHM LLP<br>1700 Lincoln Street, Suite 2700<br>Denver, Colorado 80203<br>Telephone: (303) 592-5900<br>Email: nicole.quintana@omtrial.com<br>michael.mihm@omtrial.com<br>clayton.wire@omtrial.com<br>alyssa.hill@omtrial.com | Case No:<br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

1

**EXHIBIT A**

Plaintiff Eric Sinclair, through his attorneys, Ogborn Mihm, LLP, for his Complaint against School District No. 1 a/k/a Denver Public Schools; Denver Public Schools Board of Education, each sued in their official capacity: Xochitl Gaytan; Auon'tai M. Anderson; Scott Esserman; Michelle Quattlebaum; Carrie A. Olson, Ph.D.; Charmaine Lindsay; Scott Balderman; as well as Assistant Principal Shawne M. Anderson, sued in both his individual and official capacity (hereafter, collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.    Colorado has a tragic history of school shootings. Beginning with the massacre at Columbine High School on April 20, 1999, which left 12 students and a teacher dead, and 24 students wounded, there have been repeated school shootings in Colorado. On September 27, 2006, a gunman took multiple girls hostage in Platte Canyon High School, resulting in one student dying before the gunman committed suicide. On December 13, 2013, a student at Arapahoe High School shot 17-year-old Claire Davis before the gunman committed suicide. Ms. Davis died eight days later. On May 7, 2019, two students brought guns into the STEM School in Highlands Ranch and opened fire, killing one student and injuring eight others.

2.    In the quarter century since the Columbine massacre, there have been hundreds of other school shootings in the United States. An enraged public has demanded action.

3.    The U.S. Congress enacted a raft of laws intended to prevent or limit school shootings, as has the Colorado General Assembly. In 2015, in response to the

2

**EXHIBIT A**

Arapahoe High School shooting, the Colorado General Assembly passed the Claire Davis School Safety Act, C.R.S. § 24-10-106.3 ("Claire Davis Act"), which waived sovereign immunity for school districts and established a separate legal duty of care for the school district and its employees "to exercise reasonable care to protect all students, faculty, and staff from harm from acts committed by another person when the harm is reasonably foreseeable, while such students, faculty, and staff are within the school facilities," and providing a cause of action for those students, faculty, and staff where the school district breaches such duty.

4.      Plaintiff Eric Sinclair ("Mr. Sinclair"), a former Dean of Culture at East High School in Denver, Colorado, brings this action because of the life altering injuries he suffered as the result of a foreseeable and avoidable incident in March 2023 when a 17-year-old student, A.L., shot him and another dean, Jerald "Wayne" Mason, in Room 129 of East High School.

5.      In part, Mr. Sinclair brings a claim under the Claire Davis Act because the Defendants did not exercise reasonable care to protect him, other faculty and staff, and the other students from foreseeable harm, and acted willfully and wantonly by forcing him into the position, while unarmed, of searching a student suspected of carrying a firearm onto school grounds.

6.      As the Claire Davis Act became law in 2015, courts have not yet interpreted the statute as to the claims brought by school faculty or staff injured in school shootings. Per C.R.S. § 13-17-102(7), Plaintiff brings these claims in good

3

**EXHIBIT A**

faith to assert his rights under the Claire Davis Act and, as necessary, to define and enforce the spirit and intent of a newer law in Colorado.

7. Defendants violated Mr. Sinclair's rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by creating and/or increasing the danger of Mr. Sinclair, or other similarly situated faculty and staff, being shot by a student. As such, Mr. Sinclair, also in part, brings claims under 42 U.S.C. § 1983 for Defendants' violation of his constitutional due process rights.

8. Defendants also violated the law in other ways. Defendants created a system of discipline that was unclear and inconsistently applied, ignored the District's own written policies and federal and state law, and in which there were widespread customs for applying discipline that were often directly at odds with the law and the District's own written policies. Defendants prioritized politics and statistics over safety, pressing schools to admit students, some with criminal records, who, for safety and support reasons were likely better served at alternative pathway schools. Defendants actively obstructed East High School and other schools' ability to suspend or expel students who violated Colorado law and Denver Public School policies and presented a danger to the schools. Defendants adopted a policy to remove Student Resource Officers ("SROs") from Denver's schools. When incidents of violence escalated at East High School, and the number of guns seized in the District increased five-fold, Defendants refused to return SROs to the school despite the pleas from the students, faculty and staff who were feeling unsafe. Defendants Board and the District forced East High School's unarmed deans,

4

**EXHIBIT A**

administrators, and campus safety officers into the position of confronting students suspected of having dangerous weapons and conducting searches of those students. Disturbingly, Defendants provided no training to those deans and administrators on how, while unarmed, to safely conduct searches or how to de-escalate the tensions that naturally arises while searching possibly armed, angry, or fearful teenagers. And when confronted with increasing numbers of students who were known or suspected of bringing guns onto East High School's grounds, the Defendants ignored their own written policies for disciplining those students.

9.      As a direct result of Defendants' actions, customs, and policies, on March 22, 2023, Defendants placed Mr. Sinclair into an impossible situation: alone in a room, unarmed, confronting an agitated, volatile, and dangerous teenager with a gun and, a few yards away, hundreds of other kids attending a school assembly. This predictably resulted in Mr. Sinclair being shot by the student.

10.      Mr. Sinclair brings this action because the shooting of two dedicated deans – and A.L.'s death – were foreseeable and preventable. Had Defendants followed federal and state law and, indeed, their own written policies, the shooting should have never happened. The events of March 22, 2023, were the consequence of Defendants systematically shifting responsibility for guns in schools onto faculty and staff while denying them the tools to keep people safe.  The result of Defendants' actions were two tragedies: two deans shot and an obviously gifted but immature and volatile young man dead.

**EXHIBIT A**

## PARTIES, JURISDICTION, AND VENUE

15.    At all times pertinent, Plaintiff Eric Sinclair ("Plaintiff" or "Mr. Sinclair") was a faculty member at East High School, where he had worked since 2006, and served as East High School's Dean of Culture.  Mr. Sinclair is a resident of the City and County of Denver, Colorado.

16.    Defendant School District No. 1, otherwise known as Denver Public Schools ("DPS" or "the District"), is a public school district in charge of the public school system located in the City and County of Denver, Colorado, with its principal address at 1860 Lincoln Street, Denver, Colorado 80203.

17.    Defendant Denver Public Schools Board of Education (sometimes, "the Board") is the official governing body of Denver Public Schools. Five Directors are elected within five regions in the City and County of Denver and two members are elected at large by voters across the entire city.  At all pertinent times, the five regionally elected directors were i) Scott Baldermann (District 1), ii) Xochitl "Sochi" Gaytán (District 2), iii) Dr. Carrie A. Olson (District 3), iv) Michaelle Quattlebaum (District 4), and Charmaine Lindsay (District 5). The two at-large directors were then Auon'tai "Tay" Anderson and Scott Esserman. Each of these directors is sued in her or his official capacity.

18.    At all relevant times, Defendant Shawne Anderson was the Assistant Principal at East High School and a District employee.  On information and belief, he is a resident of the City and County of Denver, Colorado.

6

**EXHIBIT A**

19.     Jurisdiction and venue are proper in the District Court for the City and County of Denver, Colorado pursuant to C.R.C.P. 98(c) as the events giving rise to this action occurred in the City and County of Denver, the District and the Board's principal office is in the City and County of Denver, and the amount in controversy exceeds $25,000.

20.     Plaintiff served Defendants with a notice of claim pursuant to the Colorado Governmental Immunity Act within 182 days of the incident giving rise to this action.

## GENERAL ALLEGATIONS

**Federal and State Law Prohibits Guns in Schools.**

21.     Federal law, the Gun-Free School Zones Act, 18 U.S.C. § 922(q)[1], makes it illegal for unauthorized individuals to possess or discharge a firearm in a "school zone."

22.     A school zone is defined as any area in or on the grounds of a K-12 school, or within 1,000 feet of school grounds. 18 U.S.C. § 921(a)(26).

23.     Colorado law also makes it a felony to bring deadly weapons onto school property. C.R.S. § 18-12-105.5(1).

24.     Colorado law relating to guns at school defines a "dangerous weapon" or "deadly weapon" as a firearm, including "any handgun, automatic, revolver, pistol, rifle, shotgun, or other instrument or device capable or intended to be

---

[1] A portion of this Act, not applicable to this case, barring sale of firearms to 18–20-year-olds, was recently held unconstitutional by the United States Court of Appeals for the Fifth Circuit. *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 483 (5th Cir. 2025).

**EXHIBIT A**

capable of discharging bullets, cartridges, or other explosive charges," under C.R.S. § 22-32-109.1(1)(c), § 22-33-102(4)(a), and § 18-1-901(2)(h).

25. Ghost guns created on 3-D printers are firearms under Colorado law and are dangerous weapons.

26. The federal Gun-Free Schools Act, 20 U.S.C. § 7961, requires each state receiving federal education funds to have a law requiring local educational agencies, such as the District, to expel students for at least one (1) year if they are found bringing a firearm onto school property.

27. Colorado law also states that it is grounds for expulsion from school for any student committing the offense of "[p]ossession of a dangerous weapon without the authorization of the school or the school district; . . ." C.R.S. § 22-33-106(1)(d).

28. In compliance with 20 U.S.C. § 7961, Colorado law also provides that, "a student who is determined to have brought a firearm to school, or to have possessed a firearm at school, shall be expelled for a period **of not less than one year**; except that the superintendent of the student's school district may modify this requirement for a student on a case-by-case basis if such modification is in writing." C.R.S. § 22-33-106(1.5).

29. The Claire Davis School Safety Act, C.R.S. § 24-10-106.3 ("Claire Davis Act"), establishes a separate duty of care for the school district and its employees "to exercise reasonable care to protect **_all_ students, faculty, and staff** from harm from acts committed by another person when the harm is reasonably foreseeable, while such students, faculty, and staff are within the school facilities," and

**EXHIBIT A**

providing a state law cause of action for those students, faculty, and staff where the school district breaches such duty.

30.     Colorado has also enacted the "Safe2Tell Act" which provides a mechanism for students and others to anonymously report students who engage in illegal or dangerous activities at schools, including bringing guns onto school property. The Colorado Attorney General administers the Safe2Tell program and widely publicizes it throughout Colorado's public and private K-12 schools.

**Defendants Have Further Duties to Develop and Uniformly Apply a Reasonable School Safety Plan and Disciplinary Procedures.**

31.     The law requires the District to adopt a mission statement making the safety of its students and staff a priority in each public school of the school district. C.R.S. § 22-32-109.1.

32.     Moreover, the law requires the District to implement a Safe School Plan following consultation with the school district accountability committee and school accountability committees, parents, teachers, administrators, students, student councils where available, and, where appropriate, the community at large, and to review and revise existing plans and policies, as necessary, in response to relevant data collected by the school district. C.R.S. § 22-32-109.1.

33.     As the District states, "the primary objective of district-wide and school-specific safety policies is to establish, promote, and maintain **the physical and psychological safety** of DPS students, staff, families, and other members of the Denver community who visit DPS schools and campuses."

9

**EXHIBIT A**

34.    Under the District's Student Conduct and Discipline Procedures, student conduct may be subject to disciplinary action "if such conduct is detrimental to the school environment and to the welfare of other students or school personnel."

35.    However, the District also determined in a written policy that "schools should minimize the use of out-of-school suspensions, recommendations for expulsion, and referrals to law enforcement, to the extent practicable while remaining consistent with state statute, local ordinances, and mandatory reporting laws."

36.    The District's 2023 Disciplinary Matrix is a summary and categorization of student offenses and the corresponding permissible school response, discipline, and reporting requirements for each level of infraction.

37.    The District's Discipline Matrix explicitly states that knowing possession of a firearm on school grounds subjects a student to a mandatory expulsion hearing, referral to the District's Department of Safety and law enforcement, a full threat appraisal, and an out of school suspension of at least five days.

38.    The District's policy on Student Searches also states that a "student's failure to cooperate with school officials conducting a search shall be considered grounds for disciplinary action."

**Defendants Did Not Fulfill Their Duties to Develop and Uniformly Apply a Reasonable School Safety Plan and Disciplinary Procedures.**

39.    In 2023, the District had more than 80,000 students and more than 10,000 employees.

**EXHIBIT A**

40.     At all relevant times, the District was aware that it has a duty to exercise reasonable care to protect all students, faculty, and staff, while within school facilities, from reasonably foreseeable harm caused by an incident of school violence.

41.     While the law requires the District to enact a concisely written conduct and discipline code to be enforced uniformly, fairly, and consistently for all students and while the District is required to review and revise existing plans and policies, as necessary, in response to relevant data collected by the school district, it failed on both counts.

42.     Although faculty and staff had expressed concerns before March 22, 2023, about the District's school safety policies (or the lack of clear policies), the District did not review or revise existing plans.  It was only <u>after</u> A.L. shot Mr. Sinclair and Mr. Mason that the District belatedly consulted with faculty and administrators about its safety policies and plans to revise them.

43.     In April and May, 2023, the District hired the firm PrincipalEd Consulting to interview safety teams from DPS high schools.

44.     Principals and safety teams at the District high schools provided blunt and unsparing feedback about the District's failings of the school safety plan and how the district responds to potentially violent students. PrincipalEd Consulting prepared a draft report (dated May 18, 2023) acknowledging the following concerns about and deficiencies in the District's 's safety policies.[2]

---

[2] The District released the May 18, 2023, draft report however, it has consistently refused to release the final version of the report. In April 2024, someone provided a final version of the report to the

**EXHIBIT A**

45.     Some of the concerns that principals and safety teams expressed to PrincipalEd Consulting include the following criticisms about the District's school safety policies and how it administers those policies:

    a.  the Safety Plan did not reflect the current reality of how schools implement safety systems within the District:

> The district Safety Plan seems to be a document representing higher level actions and the ideal and intended, but not the necessarily the current reality of the systems as they are implemented across the Denver Public Schools

    b.  Faculty and administrators often do not have <u>any</u> information about new students transferring from other school districts:

> We often do not have any information for new enrollments, especially from other school districts, and it can be a significant challenge to provide the supports new students require as they enter our school programs

    c.  Faculty and administrators generally do not have data that helps them to manage, identify and respond to threats to school safety, *i.e.*, violence:

> Data resources or protocols are not provided to schools to be used to inform attendance systems, behavior management, and academic success- we, generally, do not have MTSS systems that make data informed prevention and response systems possible

    d.  Because the District's sole focus seems to be reducing suspensions and expulsions rather than school safety, there is an inherent incentive for the District to skew the numbers by not suspending or expelling dangerous students rather than reducing school violence:

---

press. For purposes of this complaint, Plaintiff references only the draft report. Upon information and belief, the findings and recommendations of the final report are not substantially different than the draft report.

**EXHIBIT A**

Because the district's sole focus seems to be on on reducing suspension and expulsion numbers, and although schools work to represent "real" data, there is an inherent disincentive for schools to report/represent real numbers in the system

    e.   The students, parents and teachers see the District as unresponsive to their concerns about other students' violent behavior, and have lost confidence in the District's ability to provide students with a safe learning environment and to be free from violence:

The community of students sees us as not responsive to behavioral concerns represented by their peers- they have lost confidence in our ability to secure a safe learning environment (teachers and parents also hold this concern)

    f.   The deans within the District are frustrated and concerned about their ability to respond to students' violent behavior. Not being able to respond creates a "cascading effect" of escalating disruptive or violent behavior by certain students:

There is a dangerously high level of concern and frustration represented by deans in regard to their ability to be responsive to both low-level and higher level behavioral issues with students
    a.  Not being able to respond to lower-level behaviors creates a cascading effect with student behaviors escalating in behaviors over time (sometimes quite quickly)

    g.   The District pushes "transitions" for disruptive or violent students without appropriately designing the placement for the students or engaging or supporting the students:

Transitions between districts, schools, and alternative settings are pushed by the district to occur too quickly for appropriate placements to be designed and engaged for students who may need significant levels of support to be successful

**EXHIBIT A**

h. The District does not support high schools' responses to "high-level threat assessments," *i.e.*, violent students. In essence, DPS tells the high schools to "deal with it":

> There is not support from the district on significant responses to high-level threat assessments- it feels like the message is "deal with it"

i. The District does not provide Deans and school administrators with training, support, or consultation when addressing schools' "most difficult behavior situations," *i.e.*, disruptive, or violent students. The Student Equity and Opportunity Team effectively tells the schools to "deal with it" or "figure out a way":

> Deans and school administrators are not provided with training, support, or consult with our most difficult behavior situations- school sites are effectively told to "deal with it" and "figure out a way," by the Student Equity and Opportunity Team

j. The District does not hold "Habitually Disruptive Students" accountable for their behavior:

> Habitually Disruptive Students (as defined by statute and JK/JKR), are not held accountable by the system- schools have inconsistent understandings of a process relating to identifying and responding effectively and this element of policy is largely ignored by the district and not enforced

k. The School Equity and Opportunity Team blocks expulsions hearings for students who engage in multiple violent actions, and it does not provide the necessary support for those troubled students:

> School leaders are not able to elevate students who engage in multiple violent actions to expulsion hearings- this is blocked by the School Equity and Opportunity Team- students are not getting the responses and supports they need to be successful

14

**EXHIBIT A**

l.  The Student Equity and Opportunity Team limits schools' ability to be responsive to threat assessments and students' violent behavior or to keep students and staff safe:

The Student Equity and Opportunity Team members are mentioned with consistency in regard to limiting the ability for schools to: be responsive to threat assessments and violent behaviors; provide effective responses and support for students engaged in these behaviors; keep our school communities safe for students and staff. There is no level of confidence there will be advocacy and support from this team.

m.  The Student Equity and Opportunity Team will deny requests for expulsion hearing and/or consultation for violent students, but also will not provide support for creating a solution for student safety and success:

There is an understanding that requests for expulsion hearings and/or consultation will be denied and that no support will be provided in creating a solution for student safety and success by the Student Equity and Opportunity Team

n.  The District employees believe that DPS administrators do not understand the reality of how high schools try to enforce the discipline of disruptive and violent students and "[DPS administrators] cannot understand the reality from their offices":

As noted at every school site, there is a lack of understanding of the school context by district employees that "enforce" the disciplinary process on the schools. "They cannot understand the reality from their offices."

46.  The high school safety teams reported to PrincipalEd Consulting that the Disciplinary Matrix was inadequate. For example, the high school safety teams reported the following problems with the Disciplinary Matrix:

**EXHIBIT A**

a.  The District rolled out the Disciplinary Matrix without effectively communicating or training the people intended to use it:

was rolled out in 2021 without effective communication or training for the intended users

b.  The high school safety teams report that the Disciplinary Matrix does not comply with Colorado statutes and, indeed, seems to "prohibit" administrators from applying the statute:

is not in alignment with statute nor JK/JK-R and seems to prohibit the application of statutory interests with disciplinary responses

c.  The high school safety teams report that the Disciplinary Matrix does not allow schools to suspend students for disruptive behavior for more than one day, in most cases, and requires that a safety plan be in place after one day, which high schools view as being impracticable if not impossible:

Does not allow more than one day of suspension for most significant behavioral cases and requires that a safety plan is effectively in place after one day. Schools view this as impossible in most situations because students often do not deescalate in that timeframe, investigations can take longer than that timeframe, parent meetings do not always happen in that timeframe, restorative conversations do not typically happen in that timeframe, and communications with appropriate staff members are often not possible in that timeframe

d.  The high school safety teams report that not only does the Disciplinary Matrix limit schools' ability to appropriately respond to a student's significant misbehavior, *e.g.*, violent behavior, but a DPS administrator

16

**EXHIBIT A**

"consistently denies" requests to expel students who bring weapons to high school, which school leaders believe violates the statute:

Not only does the matrix limit appropriate behavioral responses, but requests for expulsion for weapons are consistently denied by ▮▮▮▮▮▮ a decision that site leaders believe is in violation of statute and policy JK/JK-R

e.   The District has used Safety Plans as a replacement for expelling disruptive or violent students, or denying admission to disruptive or violent students, or working with families to support those troubled students:

Safety Plans have become a replacement for expulsion, denial of admission, and effective problem-solving with families in regard to appropriate admissions and supports

f.   The system of providing Safety Plans instead of expelling violent students is not working and not protecting the students who may be the targets of violence:

Neither students with Safety Plans or potential victims of violent students that the district is directing to have a safety plan are being protected when we are directed to create plans instead of providing alternative settings for students, even as momentary placement, when that may be of benefit

g.   The District did not provide staffing, budgets, or training to schools when the Board decided to pull School Resource Officers from Denver high schools:

There was no resource provided to school sites, in terms of staffing, budget, or training, when the SROs were pulled

17

**EXHIBIT A**

**The Board votes to remove School Resource Officers From Denver Public Schools.**

47.    In 2020, the Board voted unanimously to terminate the District's contract with the Denver Police Department and remove all SROs from Denver public schools by June 4, 2021.  SROs are sworn police officers specially trained and certified to deal with children in a school setting. C.R.S. § 22-32-109.1(g.5) and § 24-31-312.  SROs are trained to de-escalate confrontations but also have the training to address volatile situations and, as necessary, search and disarm dangerous students to avoid shootings.

48.    In part, the Board's stated reason for removing the SROs from Denver Public Schools was to "end[] the school-to-prison pipeline."[3]

49.    Although the Board's goal of reducing the "school-to-prison pipeline" was laudable, the Board did not provide faculty and staff with the resources, training, and tools necessary to keep people safe while at school, in the absence of SROs. In essence, the District left the schools to fend for themselves. *See* paragraphs 45.c., f. – j. and 46.g. above.

50.    By removing specially and statutorily trained SROs, the District and the Board affirmatively shifted the responsibility to faculty and staff to manage, search, disarm, and de-escalate potentially violent or volatile students.  *See* paragraphs 45.c., f-j., 46.g., above.

---

[3] Statement from District Superintendent Susana Cordova in 2020, available at https://www.9news.com/article/news/education/dps-contract-with-dpd/73-a55f3ad8-54e4-4c72-bdbb-8becb4d93f7c

**EXHIBIT A**

**The Board and the District Issue a Proclamation Decrying School Violence.**

51.    According to state and federal records, in the 2021-2022 school year, the District confiscated 202 dangerous weapons from students, including 13 guns and 28 fake guns.  This was an increase of about five times as many weapons as confiscated in DPS schools in the year before the pandemic, when SROs were still in the schools.[4]

52.    As of November 2022, the District had recovered 79 weapons, including seven guns and 17 fake guns during the 2022-2023 school year.[5]

53.    Board Member Charmaine Lindsay's own grandchildren who attended East High School made her aware that "there's a hundred [guns] in the school every single day."[6]

54.    Following a shooting that occurred roughly a block from East High School in September 2022 that injured an East High School student, District Superintendent Alex Marrero acknowledged that gun violence in District schools was a "ticking time bomb."[7]

55.    Indeed, as of at least December 2022, the District and the Board were aware of the rise in gun violence and the risk that posed to faculty, staff, and students at District schools, as set forth in its Proclamation from the Denver Public

---

[4] In the 2018-2019 school year, DPS confiscated 40 weapons, including two guns and nine fake guns. See https://www.chalkbeat.org/colorado/2023/1/17/23559733/denver-schools-youth-gun-violence-alex-marrero-top-concern/.
[5] Ibid.
[6] https://www.youtube.com/watch?v=YuTz3AiwZJI starting at 31:53.
[7] Ibid.

**EXHIBIT A**

Schools Board of Education Regarding Gun Violence Prevention[8], highlighting the risk of gun violence in schools:

    a.   That DPS has seen an increase in gun violence within our communities, which poses a threat to the safety of its schools;

    b.   That gun violence has a devastating impact on its communities and that it is committed to doing everything in its power to prevent it;

    c.   That it commits to improving collaboration with law enforcement agencies to develop and implement strategies to prevent and address gun violence in its schools and communities;

    d.   That it commits to sharing information and intelligence with law enforcement to help identify potential threats and prevent acts of gun violence; and,

    e.   That it commits to re-evaluating its current policies to align with the Proclamation to support and be accountable for its work.

56.    Even after issuing its Proclamation and committing to "collaboration with law enforcement agencies" to "develop and implement strategies" to prevent gun violence, the District and the Board still did not place SROs back in the schools.

57.    The District and the Board were aware that immature kids make bad decisions and that students recognized that the people managing safety plans and searching them were unarmed and unsupported.[9]

---

[8] https://go.boarddocs.com/co/dpsk12/Board.nsf/files/CM4QXM6B749D/$file/Proclamation%20Regarding%20Gun%20Violence%20Prevention.pdf
[9] https://www.youtube.com/watch?v=YuTz3AiwZJI starting at 31:53.

**EXHIBIT A**

58.     Despite the volume of weapons and the obvious danger of immature teenagers bringing weapons, the District also provided no training to faculty and staff on how to safely conduct searches. *See, e.g.*, paragraph 46.g., above. The District's and the Board's systemic failures created a dangerous situation where it was not only foreseeable, but almost inevitable that at some point a student would shoot a member of East High School's faculty or staff.

59.     Rather, for years, the District has pressured its school administrators to admit students who have criminal convictions, or who were emotionally unstable and potentially violent.[10] *See* paragraph 45.d., e., and g. above.

60.     Despite this pressure, the District provided employees, such as Mr. Sinclair and Defendant Anderson, with almost no training and support on how to safely address behavioral problems despite school administrators' repeated objections to admitting potentially dangerous students and despite administrators' repeated requests for support in safely dealing with such students. *See* paragraphs 45.i. and 46.j. above.

61.     The District's response to the administrators' complaints and requests for support can be best summed up, as several teachers and administrators described it, as "Just deal with it." *See* paragraphs 45.h. and m. and 46.c. – g.

62.     Despite the District's knowledge of its duties and these risks, its disciplinary policies, including the JK and JK-R forms and Discipline Matrix,

---

[10] *See, e.g.*, interview with DPS McAuliffe Middle School Principal Kurt Dennis, available at https://www.9news.com/video/news/local/next/next-with-kyle-clark/next-with-kyle-clark-full-show-32423/73-d7f0a44a-50bd-42b7-a684-d6b167281b0d

**EXHIBIT A**

emphasize minimizing suspensions and expulsions of students, regardless of the

severity of their conduct, including but not limited to directing that:

    a.  Schools should minimize the use of out-of-school suspensions, recommendations for expulsion, and referrals to law enforcement, to the extent practicable;

    b.  Effective school discipline maximizes the amount of time students spend learning and minimizes the amount of time students cause disruption or are removed from their classrooms due to misbehavior;

    c.  Discipline is built on students having an opportunity to repair harm done and restore relationships whenever possible, as opposed to excluding the person who misbehaved;

    d.  District employees must abide by all applicable federal and state statutes and city ordinances, plus all relevant Board policies and procedures when dealing with disciplinary matters;

    e.  It is a goal of the Denver Public Schools and the Board of Education that the juvenile and criminal justice systems be utilized less frequently to address school-based misconduct;

    f.  When misconduct occurs, schools shall investigate the circumstances and gather facts that will help to determine appropriate interventions and consequences for that student, with emphasis on correcting student misbehavior through school-based resources at the lowest possible level. Interventions should provide students an opportunity to learn from their mistakes and re-engage the student in learning.

    63.    Even where a student exhibited violent or volatile behavior, the

District consistently put concerns about suspension and expulsion rates, *i.e.*,

statistics that make the district look bad, ahead of the safety of its students and

faculty. *See* paragraph 45.d., k., and l. above.

    64.    The District did not provide necessary support, resources, and training

to faculty, staff, and administrators, including Mr. Sinclair or Defendant Anderson,

**EXHIBIT A**

to be able to properly respond to behavioral issues with potentially violent or volatile students, such as A.L. *See, e.g.*, paragraph 45.i., and 46.g., above.

65.    Then on February 13, 2023, about five weeks before A.L. shot Mr. Sinclair and Mr. Mason, someone shot East High School student Luis Garcia, age 16, who was sitting in a car on the Esplanade in front of East High School. Luis Garcia eventually died of his injuries.

66.    Luis Garcia's shooting generated considerable publicity. The District was aware that students and staff were concerned for their safety in the wake of Mr. Garcia's shooting and were requesting the District return SROs to the school.[11]

67.    When asked whether he would have a conversation about reintroducing SROs to District schools, Denver School Board Vice President Auon-Tai "Tay" Anderson flatly and emphatically stated, "No, SROs will not be coming back to the Denver Public Schools."[12]

68.    The District took the position that the shooting occurred off campus, (although it occurred on the Esplanade in front of the school), and therefore the District was not responsible.  As such, the District and Board made no changes to existing protocol or the absence of SROs.

69.    Nevertheless, Superintendent Marrero acknowledged the February shooting was his "call to action [ ] to prevent [gun violence] from getting into our schools."

---

[11] https://www.denver7.com/news/front-range/denver/denver-public-schools-students-push-for-return-of-school-resource-officers-following-2020-removal
[12] Ibid.

**EXHIBIT A**

70.    After Luis Garcia's shooting on February 13, 2024, the District returned School Resource Officers to East High School, but for less than a week.

71.    At that point, in accordance with the Board's directive in its Executive Limitation, the District again withdrew the SROs from East High School.

72.    Two days after Luis Garcia was shot, East High School ███████

████████████████████████████████████████████████████████

████████████████████████

73.    Following Mr. Garcia's shooting, students also appeared before the Denver City Council and pleaded with the Council to return SROs to the District's schools. Students then marched from East High School to the state capitol on March 4, 2023, in a rally urging legislators to do something about gun violence in schools.

74.    As a result of the District and the Board's intentional shift of responsibility to faculty and staff for addressing immature, volatile, and potentially dangerous teenagers with guns, Defendants District, Board and Anderson created the very danger in which Mr. Sinclair found himself on March 22, 2023. Defendants thrust Mr. Sinclair into the position of confronting a volatile student with a gun and, yet, provided Mr. Sinclair with almost no ability or opportunity to protect himself, A.L., or anyone else.

███████████████████████ ████████████████████

███ ██████████████████████████████████████████

██████████████████████████████

███ █████████████████████████████████

24

**EXHIBIT A**

█   ████████████████████████████████████

████████████████████████████████████████

████████████████████████

█   ██████████████████████████████████

████████████████████

█   ████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████

█   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

█   ████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**EXHIBIT A**

26

**EXHIBIT A**

███   ████████████████████████████████

██████████████████████████████████████

████████████

███   ████████████████████████████████████

██████████████████████████████

91.     When a student "poses a threat," the District's internal policies, as set forth on the Preliminary Information Gathering Form (the "PIG-F") require a school's Threat Appraisal Team, which includes a school administrator, school counselor, and school psychologist, to initiate preliminary information gathering, complete the PIG-F", and to determine whether a full threat appraisal is necessary. The Threat Appraisal Team then submits the completed PIG-F to the District.

92.     If a full threat appraisal is performed, the full Threat Appraisal Team is required to actively gather information, including law enforcement, probation, and diversion records.

93.     Once the team provides the District with the PIG-F, the District is responsible for flagging the student's profile in Infinite Campus so that the teachers and staff who work with the student have the necessary information about the student.

███   ███████████████████████████████

██████████████████████████████████████

████████

**EXHIBIT A**

28

**EXHIBIT A**

█████████████████████████████████████████████

███████████████████████

      ████   ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

      ████   ████████████████████████████████████

███████████████████████████████████████████████

████████████

      ████   ██████████████████████████████████

████████████████████████████████████████

      ████   ██████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████

      ████   ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████

      ████   ██████████████████████████████████

█████████████████████████████████████████████

29

**EXHIBIT A**

30

**EXHIBIT A**



116. ████████████████████████████████████

████, even though they knew the following information:

    a.  There had been a dramatic increase in violence in and around East High School, to the extent that the Board even issued a Proclamation acknowledging the risks and concern;

    b.  Otherwise well-behaved kids were bringing guns or other weapons to school out fear and to protect themselves;

    c.  The District was seizing many more weapons than in earlier years, including guns;

**EXHIBIT A**

d.  There had recently been two shootings within one block of East High School, including one that killed Luis Garcia in front of the school;

e.  There were no SROs at East High School (because while the Board and the District had temporarily returned SROs to school after the Garcia shooting, the Board and School quickly removed them again);

f.  ████████████████████████████████████████████

g.  ████████████████████████████████████████

████████████████████████████████████████

████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███

█ ██████████████████████████████████

████████████████████████████████████

█████████████

███ ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████

███ █████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

32

**EXHIBIT A**

███████████████████████████████████████████████

████████████████████████

██    ████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████

**Defendants' Acts Caused Mr. Sinclair's Injuries.**

120.    Mr. Sinclair began his lengthy career with Denver Public Schools as a teacher in the 2006-2007 school year and was later promoted to the Dean of Culture at East High School where he was employed until the District terminated him last year; the District rehired him in March 2025 in a different role at another school.

121.    The job description for the Dean of Culture states: "The Dean of Culture supervises all coordinators (staff and faculty) of school events and celebrations as well as security personnel. Cultivates an inclusive school environment where all stakeholders are supported to take risks as a learner. Creates and maintains shared norms for the school, regardless of race, ethnicity, socio-economic and gender identity, etc. Ensures that all students are successful in the learning community, through coordination and oversight of intervention services to maximize the potential of all students."

122.    Among his other responsibilities at East High School, Mr. Sinclair routinely participated in student discipline matters according to the District's Discipline Matrix, including professional development for teachers on restorative discipline practices; restorative discipline practices with students; student threat

**EXHIBIT A**

appraisals; conferences with students, family, faculty, and school psychologists and social workers; suspensions, expulsion, and expulsion hearings; responding to safe-to-tell reports; and reporting out student discipline data to faculty and staff.

123.    The District's job description for a Dean of Culture does <u>not</u> include training the dean on how to safely search a student for weapons or how to manage a violent student or dangerous situation.

124.    Mr. Sinclair has no training on how to safely search a student for a weapon, de-escalate a confrontation with an armed student, or how to disarm the student.

**EXHIBIT A**

**EXHIBIT A**



133.    Denver Fire Department paramedics happened to be on the East High School campus treating a student with an unrelated medical problem.  Those paramedics came to Mr. Sinclair's assistance, applied a tourniquet, and rushed him by ambulance to Denver Health.

134.    Mr. Sinclair underwent emergency surgery at Denver Health.

135.    One of the bullets pierced Mr. Sinclair's thigh. The other bullets went through his stomach and posterior chest, damaged his diaphragm and spleen, struck a rib, and shattered in fragments within Mr. Sinclair's abdomen and lung.

136.    Mr. Sinclair suffered irreparable damage to his spleen, which required emergency surgery to remove.

137.    Mr. Sinclair suffered serious bodily injury from the shooting, with substantial risk of death and serious, permanent disfigurement, as well as substantial risk of protracted loss or impairment of the function of parts of his organs and body.

**EXHIBIT A**

138.    Mr. Sinclair spent nine days in the hospital before he was released to continue his recovery at home.

139.    Unfortunately, the bullet that pierced Mr. Sinclair's ribs caused a wound which did not heal properly. Mr. Sinclair suffered months of additional pain. He eventually underwent another surgery to plate his rib to relieve his pain.

140.    Because of the nature of his injuries, Mr. Sinclair is more susceptible to infection than most people and will require more frequent medical care over the remainder of his life.

141.    Nearly two years after he was shot, Mr. Sinclair continues to suffer pain because of his injuries, as well as permanent impairment and disfigurement.

142.    In addition, Mr. Sinclair has suffered significant emotional and psychological damage because of the shooting, including post-traumatic stress disorder.

143.    Because he is suffering from post-traumatic stress disorder, Mr. Sinclair and his therapist requested that they be allowed to return to East High School for exposure therapy and assist him with managing his PTSD and lessening the symptoms.  The District refused his request.

144.    Because of his PTSD, Mr. Sinclair was and is unable to return to work at East High School.

145.    Because of Defendants' conduct, Defendants put at risk not only Mr. Sinclair, but other students, teachers, staff, and administrators at East High School.

**EXHIBIT A**

146.    Mr. Sinclair has a clearly established substantive due process constitutional right to be free of a government actor's creation of danger from a private actor. *T.D. v. Patton*, 868 F.3d 1209, 1212 (10th Cir. 2017). Such clearly established constitutional right includes the right to be free from the government actor's creation of danger in the form of a troubled teenager with a gun. *Armijo By and Through Chavez v. Wagon Mount Public School*, 159 F.3d 1253, 1262 (10th Cir. 1998).

147.    Defendants recklessly and with deliberate indifference created the very danger in which Mr. Sinclair found himself and violated his Due Process rights under the Fourteenth Amendment.

148.    Mr. Sinclair also brings this action pursuant to the Claire Davis Act because the District utterly failed to comply with the Act's requirement that the District exercise reasonable care to protect him from a foreseeable risk of an emotionally immature and volatile student with a gun during a search.

149.    Had the District followed state and federal law, ██████████████ ████████████████████████████ and to protect its students and employees, this tragedy should not have happened.  Instead, Denver Public Schools and the Denver Board of Education chose political expediency and public relation optics over the safety of their faculty, staff, and students.

150.    In sum, through their intentional shift of responsibility for addressing immature, volatile and potentially dangerous teenagers with guns to untrained and unarmed faculty and staff without the backup of law enforcement, the Defendants

**EXHIBIT A**

District and the Board created the very danger in which Mr. Sinclair found himself on March 22, 2023. Defendants thrust Mr. Sinclair into a situation for which he was unaware and unprepared for the danger that he was confronting, and for which he was untrained – alone in a room, confronting an emotionally immature and volatile teenager with a gun, with no backup, and almost no ability or opportunity to protect himself.

151.    As a result of Defendants actions as alleged, Mr. Sinclair suffered injuries, damages, and losses, in amounts to be proven at trial, including, but not limited to:

   a.  Physical injury;

   b.  Permanent impairment and disfigurement;

   c.  Past, present, and future medical, hospital, pharmaceutical, rehabilitation, and related expenses;

   d.  Past, present, and future pain and suffering;

   e.  Past, present, and future emotional distress, including post-traumatic stress disorder;

   f.  Past, present, and future loss of earnings and earning capacity;

   g.  Past, present, and future impairment of the enjoyment and quality of a full and complete life; and

   h.  Any other and further injuries as described in the medical records, experts, or not specifically known at this time.

**EXHIBIT A**

152.    Mr. Sinclair requests prejudgment interest on a judgment as may be allowed by law.

153.    Mr. Sinclair requests an award of attorney fees as may be allowed by law.

154.    Mr. Sinclair requests a jury trial on all issues so triable.

## <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CLAIM FOR RELIEF</u>
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Substantive Due Process - State-Created Danger**
*(Plaintiff Against Defendants Denver Public Schools and Shawne Anderson)*

155.    Plaintiff Eric Sinclair incorporates all other paragraphs of this Complaint as if fully set forth herein.

156.    At all times relevant to this Complaint, Defendants Denver Public Schools ("District") and Shawne Anderson ("Anderson")(collectively, "Defendants") were acting under color of law.

157.    Defendants took the following affirmative action that actively caused Mr. Sinclair to suffer harm by a private actor. Specifically, Defendants' affirmative acts included the following:



**EXHIBIT A**



158.    On March 22, 2023, when Defendant Anderson did not respond to a radio call to come to the front desk ██████████ Mr. Sinclair responded instead, expecting a routine interaction with a student.  Instead, Mr. Sinclair found himself ██████████████ unarmed, without the support of a SRO or campus safety

41

**EXHIBIT A**

officer, and without any training on safely conducting a search for a dangerous

weapon, ███████████████████████████████████████

████████████████████████████████████

159.    By engaging in the affirmative conduct described in paragraph 157

above, Defendants created, or increased, Mr. Sinclair's vulnerability to danger from

private violence.

160.    Mr. Sinclair was a member of a limited, definable group, *i.e.*, those

unarmed deans and administrators who would have to confront and search A.L. or

other students for whom there was concern that the student was carrying a

dangerous weapon, such as a gun.

161.    Defendants' conduct put Mr. Sinclair at substantial risk of serious,

immediate, and proximate harm. Specifically, Defendants put Mr. Sinclair at risk of

harm in the following ways:

  a.  Defendants knew that there had been a substantial increase of

      incidents of violence involving guns in or about the East High School

      campus, and that Luis Garcia had been killed a few weeks earlier.

  b.  Defendants knew – because Superintendent Marrero had publicly said

      so – that otherwise well-behaved kids were bringing guns to school out

      of fear and to protect themselves.

███ ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**EXHIBIT A**



g. Defendants knew that Mr. Sinclair and the other deans had no
experience or training on how to safely conduct searches of students
suspected of concealing dangerous weapons, and were themselves
unarmed.



i. Defendants knew that SROs and campus safety officers would not
likely be available to protect or assist Mr. Sinclair and the other deans
███████████████████████ because the Board and the
District had pulled the SROs from the schools and because there were
not always campus safety officers available.

43

**EXHIBIT A**

     j.   Defendants knew that the campus safety officers were themselves unarmed, so while a campus safety officer provided some support if involved in searching an armed student, everyone involved, including the deans, would still be vulnerable.

     k.   Given the circumstances, Defendants knew, or should have known, it was almost inevitable that, at some point, a student suspected of carrying a dangerous weapon would seriously injure a dean during a search or pat-down.

162.   The risks described in paragraph 161 above were obvious and/or known risks. Again, the <u>only</u> reason to search a student for a gun is to address the risk that the student might have a gun. If the student has a gun, the obvious and known risk is that the student may use the gun.

163.   Defendants acted in reckless disregard for the risk to Mr. Sinclair and the other unarmed deans ██████████████████████ Among other reasons, Defendants' actions were reckless for the reasons outlined in paragraphs 157 and 161 above.

164.   Defendants had ample and sufficient time to deliberate about whether to take the actions that exposed Mr. Sinclair to the substantial risk of serious, immediate, and proximate harm. Specifically,

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

**EXHIBIT A**



c.  Despite its own policies recognizing the severity of the problem with a student bringing a gun onto school grounds and state and federal law making it a felony, Defendants chose not to ███████████████████

████████████████████████████████

████████████████████████████████

██████████████████

165.    Under the circumstances, Defendants were deliberately indifferent to the known extreme risks to Mr. Sinclair and other deans who might have to confront A.L.  As such, the District and Anderson's conduct shocks the conscience.

166.    Defendants' actions violated Mr. Sinclair's Due Process rights.

167.    Defendants' actions caused Mr. Sinclair's injuries and damages.

168.    As a direct, legal and proximate result of Defendants' violation of Mr. Sinclair's constitutional right to substantive due process and to be free of a state-

**EXHIBIT A**

created danger, Mr. Sinclair suffered injuries, damages, and losses as set forth in paragraph 151, above, in amounts to be proven at trial.

<u>SECOND CLAIM FOR RELIEF</u>
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Substantive Due Process - State-Created Danger**
*(Plaintiff Against Defendants Denver Public Schools and Denver Public Schools Board of Education)*

169.    Plaintiff Eric Sinclair incorporates all other paragraphs of this Complaint as if fully set forth herein.

170.    At all times relevant to this Complaint, Defendants Denver Board of Education ("Board") and Denver Public Schools ("District")(collectively, "Defendants") were acting under color of law.

171.    Defendants took the following affirmative action that actively caused Mr. Sinclair to suffer harm by a private actor.  Specifically, the Defendants' affirmative acts included the following:

   a. The District, at the direction of the Board, strongly discouraged its school administrators, such as Defendant Anderson, from referring students who brought guns to the campus to expulsion hearings or suspending those students, in violation of federal and state law. *See* paragraph 45 and 46 above.

   b. After Luis Garcia's shooting in front of East High School on February 13, 2023, and an incident with a student with a gun in the school two days later, the Defendants were aware that their decision to remove SROs from East High School was a bad decision and had created

46

**EXHIBIT A**

substantial danger for students, faculty, and staff. Indeed, the grandchildren of one Board member told her that there were numerous kids bringing guns onto the East High School campus.

c. After Luis Garcia's murder, the Defendants reinstituted SROs at East High School but kept them there less than a week. Then the Defendants removed the SROs from East High School despite their knowledge of the danger, the public outcry, and the pleas of East High School students, parents, teachers, and others.

d. Defendants' decision to remove the SROs less than a week after Luis Garcia's shooting increased the atmosphere of fear among students, faculty, and staff in East High School.

e. Defendants' decision to remove the SROs after less than a week after Luis Garcia's shooting increased the sense of impunity for students who might want to bring weapons into the school for bad reasons and the sense of fear for those students who then chose to bring weapons to school for their own protection.

f. Defendants' decision to remove the SROs after Luis Garcia's shooting placed school administrators, such as Mr. Sinclair and Mr. Mason (and Assistant Principal Anderson), in the position of having to confront an increasing number of weapons in the school and having to search or pat-down students for those weapons despite having no training on

**EXHIBIT A**

how to safely do so, while themselves unarmed, and without the

protection and backup of SROs skilled and trained for such searches.

172.   The Defendants' affirmative acts created the danger to Mr. Sinclair, or

increased the danger, by the following:

    a.   Had the Defendants not removed the SROs after Luis Garcia's

        shooting, the presence of SROs would likely have discouraged A.L.

        (and other students) from bringing a gun to school, ██████████

        ███████████████████████████████████████████

        █████████████████████████████████

    b.   Had the Board not removed the SROs, after March 6, 2023, Defendant

        Anderson could then have used the SROs to assist ████████████████

        █████████████████████████████████

    c.   Had the Board not removed the SROs, Mr. Sinclair would not have had

        to confront A.L. by himself but could instead have called for an SRO to

        assist or to conduct the search instead of Mr. Sinclair.

173.   Mr. Sinclair was a member of a limited, definable group, *i.e.*, those

unarmed deans and administrators who would have to confront, search or pat-down

students ███████████ for whom there was concern that the student was carrying a

dangerous weapon, such as a gun.

174.   The Defendants' affirmative acts put Mr. Sinclair, as a person

routinely involved in student discipline at East High School, at a substantial risk of

48

**EXHIBIT A**

serious, immediate harm, *i.e.*, the risk of being shot by a student with a gun,

██████████████████████████████████████████

175.    Defendants knew that there was a risk that a student would shoot a dean or other faculty, or the risk was obvious to Defendants for the following reasons:

    a.    Defendants knew that there had been a substantial increase of incidents of violence involving guns in or about the East High School campus, and that Luis Garcia had been murdered a few weeks earlier. *See* paragraphs 51 to 55 and 65 above.

    b.    Defendants knew – because Superintendent Marrero had publicly said so – that otherwise well-behaved kids were bringing guns to school out of fear and to protect themselves.

    c.    Defendants were actively discouraging and, indeed, interfering with school administrators from expelling students who violated school policies and/or state and federal laws. *See* paragraphs 45 and 46 above.

    d.    Defendants knew that once they pulled the SROs from East High school, the assistant principals and deans would be left to search students suspected of concealing guns and those assistant principals and deans would then have to confiscate those guns.

    e.    The Defendants knew that they had provided no training to the assistant principals and deans on how to safely search students

**EXHIBIT A**

suspected of concealing a gun. *See, e.g.*, paragraphs 45.i. and 46.g. above.

    f.   Given the growing number of guns and violent incidents, Defendants knew, or it was so obvious that Defendants should have known, it was only a matter of time before a student shot a dean or assistant principal or other faculty or staff searching the student for a gun.

176.   The risks described in paragraph 175 above were obvious and/or known risks.

177.   Defendants acted in reckless disregard for the risk to Mr. Sinclair and the other deans who might have to search students for guns. Defendants' actions were reckless for at least the reasons outlined in paragraph 171 to 172 above. Moreover, when asked if he would even have a conversation about reintroducing SROs into Denver Public Schools, including East High School, following Luis Garcia's shooting, School Board Vice President Auon'Tai Anderson said no.

178.   In the context of the escalating violence and increasing number of guns found at East High School, Defendants' decision to ignore the pleas of students, faculty and staff and to remove the School Resource Officers from East High School less than a week after Luis Garcia's shooting and Defendants' decision, instead, to place the burden and risk of searching students for guns on untrained and unarmed deans and administrators, viewed in total, is deliberate indifference to known and extreme risks, and shocks the conscience.

179.   Defendants caused Mr. Sinclair's injuries and damages.

50

**EXHIBIT A**

180.    As a direct, legal and proximate result of Defendants' violation of Mr. Sinclair's constitutional rights, Mr. Sinclair suffered injuries, damages, and losses as set forth in paragraph 151, above, in amounts to be proven at trial.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Custom
*(Plaintiff Against Defendants Denver Public Schools and Denver Public Schools Board of Education)*

181.    Plaintiff Eric Sinclair incorporates all other paragraphs of this Complaint as if fully set forth herein.

182.    Plaintiff brings this claim pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and the Tenth Circuit Court of Appeals cases interpreting *Monell*.

183.    At all times relevant to this Complaint, Defendants Denver Board of Education ("Board") and the Denver Public Schools ("District")(collectively, "Defendants") were acting under color of law.

184.    Federal and Colorado law makes it illegal for any unauthorized person to possess or discharge a firearm on school property. Such is a crime. *See* paragraphs 21 through 24, above.

185.    Federal and Colorado law also require schools to expel students for at least one (1) year if they are found bringing a firearm onto school property. *See* paragraphs 26 through 28, above.

186.    The Claire Davis Act, a state law, also imposed a duty of care upon all Defendants "to exercise reasonable care to protect all students, faculty, and staff

**EXHIBIT A**

from harm from acts committed by another person when the harm is reasonably foreseeable, while such students, faculty, and staff are within the school facilities."

187.    The District's written Policy JK-R, dated January 14, 2018, states that if a hearing officer determines that the student possessed a firearm on school grounds, the recommended discipline is that the student **shall be expelled** for one year:

> 2. For a Type Six offense, if the hearing officer determines that the student possessed a firearm on school grounds, the recommended consequence shall be expulsion for a duration of one year.

188.    Moreover, the Discipline Matrix states that for Type Six conduct, *i.e.*, knowing possession of a firearm, and the most serious conduct identified on the Discipline Matrix, if a student is found with possession of a gun on school grounds, the school shall:

    a.    Automatically suspend the student for five days;

    b.    Refer the student for a mandatory expulsion hearing;

    c.    Refer the matter to law enforcement or DPS Safety department; and

    d.    Conduct a Full Threat Appraisal of the student.

| Conduct | Definition | Discipline Ladder Reference | Recommendation For Expulsion | School Referral to Law Enforcement or DPS Safety (See Note 2) | Essential Protocols | OSS/ISS ECE - 3rd Grade | OSS/ISS Grades 4 - 12 |
|---|---|---|---|---|---|---|---|
| **Type Six** | | | | | | | |
| Firearm | - Knowing - possession* - of a firearm** * Possession means actual or physical control as opposed to fleeting contact. Incident must occur on school grounds, in a school vehicle, or at a school sanctioned event. If off-campus, there must be a sufficient nexus to school. ** Includes handguns, rifles, shotguns. This does not apply to objects such as toy guns, facsimiles, cap guns, bee-bee guns, and pellet guns. | Refer to Recommendation for Expulsion Column | Mandatory Expulsion Hearing | If firearm is on school grounds, in school's possession, or there is a threat of serious bodily injury that is real and immediate, mandatory referral to DPS Dept. of Safety (3-3911) and law enforcement (911 or non-emergency 720-913-2000) | Full Threat Appraisal | Consultation with OS. 3 - 10 day OSS. Request expulsion hearing. | OSS of 5 days |

189.    Upon information and belief, Defendants had an informal custom amounting to a widespread practice that, although not authorized by written law or express written policy, was so permanent and well settled as to constitute a custom

**EXHIBIT A**

or usage with the force of law. *See* paragraphs 45 to 46 above.  It was widespread and pervasive.  The custom and widespread practice was that, even if a school principal or other school administrator attempted to refer a student for an expulsion hearing for possessing a gun, or to follow the Disciplinary Matrix, the District's School Equity and Opportunity Team would veto the referral and not allow the school to expel the student. *See* paragraphs 45 to 46 above.

190.    In practice, while their conduct was a crime and violated federal and state law, students who brought guns to school, such as A.L., faced little disciplinary consequence.

191.    By March 2023, the increasing number of guns in the school was such that some students were so afraid that they began bringing guns onto school grounds for self-protection.

192.    Defendants' unwritten policy and pervasive custom created a circumstance ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

193.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Defendant Anderson should have strictly complied with Policy JK-R and the Disciplinary Matrix for Type 6 conduct. However, Defendant Anderson did not do so.  ███████████████████████

███████████████████████████████████████████

**EXHIBIT A**



194.   Specifically, had the Defendants followed their written policies, Policy JK-R and the Disciplinary Matrix for Type 6 conduct, and federal and state law, they should have immediately:

195.   Had Defendants followed their written policies, they also should have immediately ████████████████████████████████████

196.   Had Defendants followed the law and their written policies, instead of following their customs and widespread and pervasive practices, ████████

197.   The Defendants' decision to push the school principals and administrators to follow the custom instead of federal and state law and their own

54

**EXHIBIT A**

written policies violated Mr. Sinclair's clearly established constitutional right to be free of state-created danger.

198.    Defendants' decision to follow their custom instead of their written policies, and federal and state law, in essence, forced their employees to violate state law in the face of well-known and increasing danger to students, faculty and staff.

199.    Defendants' decision to follow their custom instead of their written policies, and federal and state law, directly caused the harm to Mr. Sinclair as it placed deans (who were the people tasked to search students for guns in the absence of SROs or campus safety officers) directly in harms' way. Specifically, there is no need to search a student for a gun unless there is a reasonable suspicion or concern that the student may be carrying a gun. If there is such a suspicion, there is a risk that the student, in fact, may possess a gun. If the student in fact has a gun, such is an obvious risk that the student, in the heat of the moment, may use the gun to harm the person searching him.

200.    Defendants knew that their custom and widespread practice of not following federal and state law and their own written policies created or increased danger to people, such as unarmed deans like Mr. Sinclair, who were forced to search students who may be armed. Defendants' actions were a form of willful blindness. As such, Defendants' actions were deliberately indifferent to the risks to Mr. Sinclair's safety and his constitutional right not to be subject to a state-created danger of being shot by troubled teenager with a gun.

**EXHIBIT A**

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Failure to Train
*(Plaintiff Against Defendants Denver Public Schools and Denver Public Schools Board of Education)*

201.    Plaintiff Eric Sinclair incorporates all other paragraphs of this complaint as if fully set forth herein, in particular paragraphs 181 through 200 and paragraphs 219 to 234.

202.    Plaintiff brings this claim pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and the Tenth Circuit Court of Appeals cases interpreting *Monell*.

203.    At all times relevant to this Complaint, Defendants Denver Board of Education ("Board") and the Denver Public Schools ("District")(collectively, "Defendants") were acting under color of law.

204.    Defendants failed to train Defendant Anderson on how to safely search a student for a weapon, what steps to take, and the specific routine and practice that should be followed (assuming that SROs and campus safety officers were not going to be present for searches).

205.    Upon information and belief, Defendants' failure to train Mr. Anderson was the moving force behind and directly caused injury to Mr. Sinclair in the following ways:

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

56

**EXHIBIT A**



b.  Defendant Anderson should have been trained that when he searched

a student for a gun, there was a possibility that the student would, in

fact, have a gun and that he needed to then know how best to protect

himself and others, and how to disarm the student. Otherwise, what

was the point of the search?



206.  Defendants' failure to train Mr. Anderson and the other deans and

administrators is also the moving force behind the injuries to Mr. Sinclair because,

had Defendants properly trained Mr. Anderson:

**EXHIBIT A**

a. Mr. Sinclair would not have been in a position of covering for Mr. Anderson. ██████████████████████

██████████

████████████████████████

██████████████████████████

████████████

c. Mr. Sinclair would have been in a position to better protect himself assuming that A.L. brought a gun and Mr. Sinclair or the campus security officer discovered the gun.

207.    Upon information and belief, any dean or administrator who could reasonably be expected to be involved in searching a student for a dangerous weapon, or assisting Mr. Anderson in such searches, such as Mr. Sinclair, should also have had the same training as Mr. Anderson.

208.    Upon information and belief, few if any of the deans or other school administrators at East High School, including Mr. Sinclair, were properly trained to search students for dangerous weapons despite their almost daily involvement in such searches.

209.    Upon information and belief, the untrained and unarmed deans and administrators were searching students for weapons daily when campus safety officers were not available, and so the deans and administrators were left to conduct the searches without support and backup.

**EXHIBIT A**

210.    Defendants' failure to train Mr. Anderson or the deans at East High School was a deliberate and conscious choice. Upon information and belief, the Deans made a deliberate and conscious choice in at least five ways:

a.  First, Defendants knew that the deans and administrators were involved in searching students for weapons on a frequent basis.

b.  Second, Defendants knew that the deans and campus safety officers were unarmed, and that they thus needed special training when unarmed persons and searching possibly armed teenagers.

c.  Third, Defendants knew that campus security officers were spread thin, were not always available, and so the deans and administrators were left to conduct the searches without support.

d.  Fourth, Defendants knew that most if not all the deans and administrators did not have the appropriate training to search students for dangerous weapons and de-escalate dangerous situations.

e.  Fifth, Defendants did not require or develop a policy for training for the deans and administrators on conducting searches for weapons.

f.  Sixth, Defendants did not allocate funds for such training.

██ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

**EXHIBIT A**

██ ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

213.    But for Defendants' failure to train Defendant Anderson on the appropriate procedures for conducting a search, █████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

214.    But for Defendants' failure to train Defendant Anderson on the appropriate procedures for conducting a search, █████████████████████████

████████████████████████████████████████████████

215.    But for Defendants' decision not to train Mr. Anderson and the other deans on how to properly conduct searches for weapons, ██████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

216.    Defendants' failure to train Mr. Anderson directly caused harm to Mr. Sinclair as it placed Mr. Sinclair in danger, █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

**EXHIBIT A**

██████████████████████████████████████

██████████████████████████████████████████

██████

217.    Defendants' actions in failing to train Mr. Anderson or the other deans at East High School were deliberately indifferent to Mr. Sinclair's rights and safety.

218.    Defendants' failures to train violated Mr. Sinclar's Due Process rights as more fully described in paragraphs 205 to 210 above.

### FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Systemic Failures
*(Plaintiff Against Defendants Denver Public Schools and Denver Public Schools Board of Education)*

219.    Plaintiff Eric Sinclair incorporates all other paragraphs of this complaint as if fully set forth herein, in particular paragraphs 181 through 200 and paragraphs 201 to 218.

220.    Plaintiff brings this claim pursuant to *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and the Tenth Circuit Court of Appeals cases interpreting *Monell.*

221.    At all times relevant to this Complaint, Defendants Denver Board of Education ("Board") and the Denver Public Schools ("District")(collectively, "Defendants") were acting under color of law.

222.    Colorado law requires the District to implement a Safe School Plan created with input from stakeholders.  *See* paragraphs 31-32 above. The District failed to do so and, indeed, not until the public outcry after March 22, 2023, did the

**EXHIBIT A**

District take steps to create an adequate Safe School Plan. The District introduced its revised Safe School Plan 3.0 on June 30, 2023.

223.    In 2020, the District (at the Board's direction) removed all School Resource Officers from schools.

224.    As a direct result of Defendants' decision to remove the SROs from the schools the incidents of violence at East High School escalated in 2021 – 2023, with repeated instances of students bringing guns to school. Upon information and belief, approximately five times as many guns were being brought into Denver Public Schools after Defendants removed the SROs than before. Despite these disturbing trends, the Board refused to reinstate SROs at its schools, including East High School.

225.    After Luis Garcia was killed on February 13, 2023, the District reinstated the SROs for less than a week, but then abruptly removed them again, over the objection of parents, students, faculty and staff at East High School.

226.    Students, faculty, and staff pressed the Board to permanently return the SROs, making clear that they lived in fear at East High School. Students appeared before the Denver City Council and begged for return of the SROs and marched from East High School to the state capital to express their views.[13]

227.    The Board was unmoved. Indeed, on February 23, 2023, in an interview to Denver7 reporter, Board Vice President Auon'Tai Anderson, speaking

---

[13] https://www.denver7.com/news/front-range/denver/denver-public-schools-students-push-for-return-of-school-resource-officers-following-2020-removal

**EXHIBIT A**

on behalf of the Board emphatically stated: "No, SROs will not be coming back to the Denver Public Schools."[14]

228.    Upon information and belief, the District did not enforce its written policies requiring an assessment of students with disciplinary problems or who might pose a threat.

229.    The District required schools to admit troubled students who, because of their own specific needs, and the safety of the other students, likely should not be placed with other students, but should have, instead, been placed in alternative education settings suitable to their needs.

230.    In summary, the District's systemic problems exacerbated the dangers in the school and increased the risk of violence to students, faculty and staff in that:

a.    Defendants did not create or enforce clear and consistent policies;

b.    Defendants did not follow their existing policies but, instead, followed a custom or widespread practice of ignoring policies about expelling students who were bringing guns into the school;

c.    Defendants did not revisit their policies as C.R.S. § 22-32-109.1 requires them to do; and

d.    Defendants refused to even consider reinstating the SROs in East High School despite the mounting violence and the five-fold increase in guns in the schools.

---

[14] *Id*., at 1:20 – 1:30 time stamp.

**EXHIBIT A**

231.    Moreover, despite knowing of the dangers of directing unarmed administrators, faculty and staff to confront students suspected to be armed with dangerous weapons, as discussed in paragraphs 205 through 210, above, the Defendants failed to adequately train its administrators and teachers who were forced to confront disruptive students with dangerous weapons.

232.    The District and the Board's failure to train its administrators was so pervasive as to amount to deliberate indifference to the dangers faced.

233.    Defendants' systemic failures caused injury and damages to Mr. Sinclair.

234.    As a direct, legal, and proximate result of Defendants' systemic failures that violated Mr. Sinclair's constitutional rights, Mr. Sinclair suffered injuries, damages, and losses as set forth in paragraph 151, above, in amounts to be proven at trial.

<u>SIXTH CLAIM FOR RELIEF</u>
**Claire Davis School Safety Act, C.R.S. § 24-10-106.3**
*(Plaintiff Against Defendant Denver Public Schools and Defendant Anderson)*

235.    Plaintiff Eric Sinclair incorporates all other paragraphs of this Complaint as if fully set forth herein.

236.    At all times relevant hereto, Defendants Denver Public Schools and Defendant Anderson ("Defendants") owed a duty to Mr. Sinclair to exercise reasonable care to protect all students, faculty, and staff within Denver Public Schools and, specifically, East High School.

64

**EXHIBIT A**

237.    Defendants' failure to exercise such reasonable care resulted in a foreseeable incident of school violence on March 22, 2023, by a student, A.L., against two faculty members, Mr. Sinclair and Mr. Mason, which caused serious bodily injury to Mr. Sinclair and Mr. Mason.

238.    Specifically, the incident of school violence involved a student, A.L., who, with intent to cause serious bodily injury to Mr. Sinclair and Mr. Mason, did cause such serious bodily injury to Mr. Sinclair and Mr. Mason, by means of a deadly weapon, a gun, and/or under circumstances manifesting extreme indifference to the value of human life and created a grave risk of death to Mr. Sinclair and Mr. Mason.

239.    Defendant Denver Public Schools breached the duty of care to Mr. Sinclair by at least the following acts and/or omissions:

   a.    Defendant chose not to develop and enforce reasonable and effective safety plans and protocols to prevent foreseeable incidents of school violence;

   b.    When developing its inadequate safety plan and protocols, Defendant chose to ignore the views of parents, teachers, administrators, students, and others not part of the District's central administration;

   c.    Defendant chose not to develop and enforce a reasonable discipline matrix and threat appraisal protocols;

**EXHIBIT A**



i.  Defendant forced unarmed administrators into the position of searching students, including those who were suspected of possessing firearms; managing dangerous situations; and de-escalating such situations;

**EXHIBIT A**

j.  Having forced unarmed administrators into the position of searching students, Defendant failed to train personnel to manage students attending under a safety plan, manage dangerous situations, and de-escalate such situations;

k.  Defendant terminated its contract with the Denver Police Department to provide School Resource Officers for the safety of students, faculty, and staff;

l.  After briefly returning the SROs to East High School following Luis Garcia's shooting, again removing the SROs over the objection of the students, faculty, and staff; and

m.  Defendant acted in an otherwise unreasonable, negligent manner with respect to protecting all students, faculty, and staff from reasonably foreseeable acts of violence at the school, as will be demonstrated by evidence at trial.

241.  Additionally, Defendant Anderson breached the duty of care to Mr. Sinclair by at least the following reckless and willful and wanton conduct:

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

**EXHIBIT A**



f.  Forcing Mr. Sinclair and other unarmed deans into the position of searching a student suspected of carrying a weapon onto school grounds by failing to be available ███████████████████████

███████████████████

g.  Defendant Anderson acted in an otherwise willful and wanton manner with respect to protecting all students, faculty, and staff from reasonably foreseeable acts of violence at the school, as will be demonstrated by evidence at trial.

242.  Defendants caused Mr. Sinclair's injuries and damages.

**EXHIBIT A**

243.    As a direct, legal and proximate result of Defendants negligence and/or willful and wanton conduct, Mr. Sinclair suffered injuries, damages, and losses as set forth in paragraph 151, above, in amounts to be proven at trial.

244.    The acts and/or omissions of the Defendant's employees, agents, administrators, board members, superintendent, officers, and representatives are imputable, at law, to the Defendant and it is, therefore, vicariously liable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter an Order of Judgment in favor of Plaintiff and against Defendants in an amount to be determined at trial, plus prejudgment interest and post judgment interest allowed by Colorado law, for costs, expert witness fees, attorney fees, and other items allowed by statute or rule, and for such other and further relief this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL TO A JURY OF SIX (6) PEOPLE.**

Dated this 21st day of March, 2025.

OGBORN MIHM, LLP

*/s/ Nicole M. Quintana*
Nicole M. Quintana, Atty. Reg. No. 42675
Michael T. Mihm, Atty. Reg. No. 14768
Clayton E. Wire, Atty. Reg. No. 41717
Alyssa E. Hill, Atty. Reg. No. 56429
1700 Lincoln Street, Suite 2700
Denver, Colorado 80203
Telephone: (303) 592-5900
Email: nicole.quintana@omtrial.com
        michael.mihm@omtrial.com
        clayton.wire@omtrial.com
        alyssa.hill@omtrial.com

**EXHIBIT A**

<u>Plaintiff's Address:</u>
8155 E. Fairmount
Denver, Colorado 80230

**EXHIBIT A**